R. FRANCES GROMMERS, Petitioner, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Grommers v. Commissioner
Docket No. 275-90.
United States Tax Court
T.C. Memo 1992-343; 1992 Tax Ct. Memo LEXIS 360; 63 T.C.M. (CCH) 3144; June 15, 1992, Filed *360 Decision will be entered under Rule 155. Robert B. Dugan, for petitioner. Louise Forbes, for respondent. WRIGHT
WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION WRIGHT, Judge: Respondent determined the following deficiencies in and additions to petitioner's Federal income taxes: Additions to Tax
Year
Deficiency
Sec.6651(a)(1)
Sec.6653(a)
Sec.6653(a)(2)
1980
$ 16,253
$ 4,064
$ 1,186
1985
163
41
8
50% of the
interest due
on $ 163
R. Frances Grommers (hereinafter petitioner) paid interest expense of $ 16,086 during taxable year 1985 which was disallowed as a deduction on petitioner's 1985 Form 1040, Schedule C. Respondent conceded that the interest expense would be deductible on petitioner's 1985 Form 1040, Schedule A, and that this alternative allowance would result in no deficiency or additions to tax for taxable year 1985. Therefore, a Rule 155 computation will be necessary in this case. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issues for decision are: (1) Whether petitioner's *361 activities with respect to the sole proprietorship INCAPCO were engaged in for profit during the taxable year 1980. We hold that such activities were not engaged in for profit. (2) Whether petitioner is liable for the section 6651(a)(1) addition to tax for failing to timely file her 1980 income tax return. We hold that petitioner is liable for the section 6651(a)(1) addition to tax. (3) Whether, pursuant to section 6653(a), petitioner's underpayment of income tax for taxable year 1980 was due to petitioner's negligence or intentional disregard of rules and regulations. We hold that petitioner is liable for the section 6653(a) addition to tax. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated herein by this reference. At the time petitioner filed her petition, she resided at 20 rue Oradour-sur-Glane, Paris 15, France. Petitioner filed her 1980 Federal income tax return with the Director, Internal Revenue Service, New York, New York, in October 1984. On petitioner's 1980 income tax return, she claimed a $ 149,000 loss on Schedule C. Petitioner listed the name of the business as INCAPCO, *362 and described the business activity as capital marketing. INCAPCO's business address was listed as 100 Memorial Drive, Cambridge, Massachusetts. Petitioner established INCAPCO during taxable year 1980 to market intellectual capital. INCAPCO is currently an ongoing business whose principal place of business is located at 20 rue Oradour-sur-Glane, Paris 15, France. During its existence, INCAPCO has never reported a net profit. During taxable year 1980, petitioner reported interest income of $ 11,908, dividend income of $ 12,378, and income from Schedule E of $ 125,384. For taxable year 1980, petitioner claimed a $ 149,000 loss from the business activity of INCAPCO. During taxable years 1982, 1984, and 1985, petitioner claimed losses from INCAPCO in the amounts of $ 132,528, $ 82,488, and $ 82,488, respectively. Educational Background and Work Experience
In 1952, petitioner received a bachelor of science in architecture and city planning from Harvard University, Cambridge, Massachusetts. In 1961, petitioner received her medical degree from Harvard University. In 1964, petitioner received a master of public health from the Harvard School of Public Health. Petitioner *363 was appointed an assistant professor of health service administration in the School of Public Health at Harvard in 1969. Petitioner had an extensive background in computer simulation programs and computer models for decision making. Petitioner provided consulting services on computer applications and medical technology in hospital administration. Petitioner's experience included consulting in the area of program development for both hospital administration and hospital layout and design. Between 1971 and 1974, petitioner served on an advisory committee appointed by the Secretary of Health, Education, and Welfare. The purpose of this committee was to examine automated personal data systems and the use of Social Security numbers as a universal reference number for all records. Petitioner is fluent in English, Dutch, and French. Petitioner has had, on a regular or audit basis, approximately 10 courses in economics, most of which were attended prior to 1980. In 1981, petitioner became a licensed stock broker, after taking courses at the New York Institute of Finance. In 1981, petitioner took a course at the Securities Training Corporation, series 7 general securities and options. *364 INCAPCO'S Genesis and 1980 Activity
During the seventies, petitioner was married to-Engelbert L. Grommers, a Dutch citizen. From 1965 to 1973, petitioner's husband was based in Paris and managed the Eurofund, an investment company. From 1974 until his death in 1979, petitioner's husband was a partner with the international banking firm of Lazard Freres. Lazard Freres has offices in New York, London, and Paris. As a representative of Lazard Freres, petitioner's husband was required to travel extensively as he acted as a liaison partner between the New York, London, and Paris offices of the firm. During every 7-week period, petitioner's husband spent 3 weeks on extended visits to Paris or Holland. During these extended visits to Europe, petitioner often accompanied her husband and was very familiar with Paris prior to 1980. Petitioner spent most of her adult and business life in Paris and in London. Sometime during 1978, petitioner's husband was diagnosed with cancer. Petitioner referred her husband to a physician in Boston named Dr. Kurt Isselbacher. Petitioner was familiar with Dr. Isselbacher from her days as a student at Harvard Medical School. During her husband's *365 illness, petitioner learned of Dr. Isselbacher's patent for an anticancer agent (hereinafter CAGA). During 1980, petitioner was interested in establishing a company which would develop and commercialize CAGA. In 1980, petitioner at various times attempted to obtain the financing necessary to develop and commercialize Dr. Isselbacher's anticancer agent. Prior to 1980, petitioner had no experience in procuring investment capital for businesses that engaged in the development and commercialization of any product similar to CAGA. Petitioner and Dr. Isselbacher never entered into a formal written contract concerning CAGA during 1980. Petitioner never received any remuneration for her attempt to generate interest in the CAGA project or her efforts to obtain investment capital for the commercialization of CAGA. At the time of her husband's death in July 1979, petitioner became seriously ill from a ruptured appendix, gangrene, peritonitis, and septicemia. Due to illness, petitioner was convalescing for the 8 months that followed her husband's death. Petitioner spent the month of January 1980 in Boston, Massachusetts. While in Boston, petitioner stayed at either the Ritz Carlton or *366 the Sonesta Hotel. Dr. Isselbacher was associated with Massachusetts General Hospital in Boston. While in Boston, petitioner occasionally met with Dr. Isselbacher and gathered information concerning the CAGA project. Also during the month of January, petitioner met with artist Robert Morey to determine if Morey would be interested in setting up an exhibit of his work at Drouot, an art auction house in Paris, France. The amount of time that petitioner spent in January pursuing the CAGA project or the Morey art project is uncertain. From February 2 through 19, 1980, petitioner stayed at the Caribe Hilton Hotel or the Condado Hotel in San Juan, Puerto Rico. In San Juan, petitioner met with Welby Van Horn, a tennis teaching professional at the Caribe Hilton. Petitioner envisioned using Welby Van Horn's instructional methods as part of a television program that would teach children how to play tennis. Petitioner was also interested in producing an instructional video cassette for the use of coaches, schools, or children. At some time in 1980, petitioner observed a sports presentation on Pacific Mountain Network, which petitioner considered to be well produced. Petitioner contacted *367 the producer of the Pacific Mountain Network sports presentation to discuss the potential of the Van Horn project. Petitioner consulted with Dr. Gerry Lesser, professor of education at Harvard University, who had been involved in the design of the "Sesame Street" program. Petitioner paid a producer from Pacific Mountain Network $ 3,000 to write a production description for the Van Horn tennis project. It is not certain whether petitioner paid this amount in 1980, 1981, 1982, 1983, or 1984. Petitioner never completed the Van Horn tennis project and discontinued her efforts on the project before any marketable product was produced. Petitioner never realized any income from the Van Horn tennis project. The amount of time petitioner spent on the Van Horn tennis project in San Juan is uncertain. From February 20 to February 26, 1980, petitioner was in Boston. During this time, petitioner gathered further information concerning CAGA. On February 27, 1980, while in New York City, petitioner met with her attorney to discuss an estate administration problem she was confronting which resulted from her husband's death. Petitioner also met with Richard Riechler and William Doino of *368 Ernst & Whinney, an accounting firm. While speaking with Riechler and Doino, petitioner expressed her interest in establishing a company that would develop and commercialize CAGA. Petitioner spent most of the month of March in New York City. During March, petitioner sought investors for the CAGA project. She also visited several art galleries and spoke with gallery directors and art auctioneers. Petitioner visited the Metropolitan Museum to view the Chinese archaic jade and bronze section because she had an interest in assembling a group of investors to purchase and sell such items. While in New York City, petitioner stayed at the Hyde Park Hotel. Petitioner did not utilize a separate office facility in New York other than the Hyde Park Hotel. Petitioner claimed office rent expense of $ 1,600 a month, or $ 19,200 annually, which represented her rental expenses at the Hyde Park Hotel. Petitioner rented a suite in the Hyde Park Hotel in New York City on an annual basis although she spent only 5 or 6 weeks in New York City during 1980. In March 1980, petitioner made several visits to Sotheby's art auction house in New York City to compare the price of various works of art with *369 the price of similar items at Drouot in Paris, France, and Sotheby's in London, England. From March 30 through April 15, 1980, petitioner returned to San Juan, Puerto Rico. In San Juan, petitioner investigated the import-export market for handmade furniture constructed in San Juan. Petitioner never entered the import-export business involving the sale of handmade furniture from San Juan. On April 15, 1980, petitioner returned to New York City where she met with her attorneys and discussed her estate administration problems and the CAGA project. On April 22, 1980, petitioner traveled to Boston, Massachusetts. In Boston, petitioner visited a gallery at Faneuil Hall to determine if it would be a desirable location to show some of Robert Morey's work. Petitioner remained in Boston through May 13 and visited Massachusetts General Hospital several times to gather information concerning the CAGA project. From May 16 to November 30, 1980, petitioner rented a suite and used the facilities of the Queen Elizabeth Hotel in Paris, France. Petitioner did not have a separate office facility in Paris other than the Queen Elizabeth Hotel. Petitioner claimed an office rent expense deduction *370 in the amount of $ 36,000 for the rental of her suite at the Queen Elizabeth Hotel in Paris. While in Paris, petitioner often visited Drouot, a Government art auction house. Petitioner visited Drouot on a regular basis and viewed various items to determine their marketability. Petitioner investigated leasing space to show art exhibits but her efforts never reached fruition. Petitioner had a particular interest in antiquities (i.e., objects dating from before the time of Christ) such as Roman glass and vases, Chinese archaic bronzes, archaic Chinese jade, and Middle Eastern funeral bronzes. Petitioner also had an interest in Flemish and Polish tapestries. Petitioner investigated the price differential of various works of art shown at Drouot in Paris, Sotheby's in London, and Sotheby's in New York City. Prior to 1980, petitioner had frequently visited various auction houses such as Drouot. Petitioner never sold any of the works of art that she purchased and never was able to attract investors for the purpose of acquiring works of art and reselling for profit. In May 1980, petitioner met with an investment banker from Bankers Trust to discuss assembling an investment group to *371 finance the exhibition of an art collection owned by an auctioneer of ancient collections by the name of Maignan. Petitioner was not successful in forming an investment group to exhibit the collection of Maignan. While in Paris, petitioner engaged in a significant number of personal stock transactions on a regular basis. Petitioner occasionally met with persons in the business community in an attempt to generate interest in the financing of the CAGA project. Petitioner had a great appreciation for harpsichord music. Petitioner contacted Mr. Mercier-Ythier, a Frenchman, seeking his advice on antique harpsichords. Over a period of years petitioner bought five harpsichords. For taxable year 1980, petitioner paid for, and claimed as an expense, a master recording of harpsichordist Belina Drandarova, which was produced at Versailles. Petitioner never made any sales of her master recording of the harpsichord music, or derived any income therefrom. Petitioner never sold any of the harpsichords that she purchased. Petitioner also considered forming a syndicate to purchase the Queen Elizabeth Hotel in Paris. After investigating this opportunity in more detail, petitioner decided *372 against organizing a group to purchase the Queen Elizabeth Hotel. From August 7 to August 12, 1980, petitioner visited London, England. During petitioner's stay in London, she visited Sotheby's, an art auction house, and met with a portfolio manager for Morgan Guaranty's International Investment Portfolio. From August 13 through the end of October 1980, petitioner returned to the Queen Elizabeth Hotel in Paris. During the first week of November 1980, petitioner spent approximately 6 days at the Marbella Club, a resort in Marbella, Spain, which is located on the Costa Del Sol. Petitioner claimed her Marbella Club hotel bill of $ 1,059.28 as a business expense on her Schedule C for taxable year 1980. Petitioner testified that she visited Marbella for the purpose of examining the facilities to determine whether they would be adequate for a tennis fantasy program that she envisioned. The tennis fantasy program would provide business executives with the opportunity to participate in tennis matches with Welby Van Horn and other tennis professionals. Petitioner produced no evidence indicating that she had a contract with Welby Van Horn concerning the tennis fantasy program, and, *373 in fact, never did establish such a program. On November 8, 1980, petitioner returned to Paris and remained there for the remainder of the month. During November, petitioner engaged in occasional attempts to generate interest in the CAGA project. In November, petitioner continued to manage her personal investment protfolio on a regular basis. In December 1980, petitioner returned to Boston, Massachusetts. In Boston, petitioner met with persons in the business community in an attempt to generate interest for the CAGA project. During the last week of December, petitioner returned to San Juan, Puerto Rico. During taxable year 1980, petitioner never issued a bill for services rendered by INCAPCO. Petitioner did not maintain a set of accounting records for INCAPCO's activity for taxable year 1980. Petitioner did not maintain a separate checking account for INCAPCO's activity during 1980. Petitioner testified that she did not have any personal expenses other than prescriptions and clothing. At trial, petitioner produced a calendar which described her activity during 1980. Some of the activities listed on the calendar were not entered contemporaneously in 1980, but instead were *374 listed on petitioner's calendar at some time in 1984 when petitioner was reviewing her American Express vouchers in preparation of her 1980 income tax return. During and subsequent to 1980, petitioner did not sell any art objects for profit. Similarly, petitioner was unsuccessful in forming an art tapestry syndicate. Petitioner never succeeded in leasing space for the presentation of art exhibits or in an attempt to sell works of art. Petitioner never derived any income from her harpsichord music activity. Petitioner never issued an offer for the purchase of the Queen Elizabeth Hotel. Petitioner never derived any income from the Welby Van Horn tennis project. Petitioner never received any remuneration for her services regarding the CAGA project and never derived any income from such activity. For taxable year 1980, petitioner received an extension of time to file her return until October 15, 1981. Petitioner testified that she had not received bank statements and other documents from third parties which were needed to accurately prepare petitioner's 1980 income tax return. Petitioner testified that she had not received all the necessary documentation even as late as the *375 fall of 1982. Petitioner's 1980 income tax return was prepared by Ernst & Whinney and filed in October 1984. OPINION As a preliminary matter, we must consider a motion made by petitioner during trial which we took under advisement. Petitioner moved to exclude from evidence the following items set forth in the parties' supplemental stipulation of facts: (1) During the taxable years 1982 and 1984, petitioner claimed losses from INCAPCO in the amounts of $ 132,528 and $ 82,488, respectively. (2) INCAPCO has not reported a net profit during its business existence. Petitioner notes that the taxable year in issue is 1980, and argues that subsequent years are not relevant to a section 183 analysis concerning profit objective. We reject petitioner's contention and conclude that the facts stipulated by the parties that concern subsequent years are relevant to our analysis of profit objective under section 183. Section 1.1832(b), Income Tax Regs., lists several relevant factors to consider in determining whether an activity is engaged in for profit. Among those factors is a consideration of the taxpayer's history of income or losses with respect to the activity. Sec. 1.183-2(b)(6), *376 Income Tax Regs.Section 1.183-2(b)(6), Income Tax Regs., provides that a series of losses during the initial or startup stage of an activity may not necessarily be an indication that the activity is not engaged in for profit. However, where losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status, such continued losses, if not explainable as due to customary business risk or reverses, may indicate that the activity is not being engaged in for profit. Clearly, an analysis of a taxpayer's profit or loss over a series of years is relevant in determining whether an activity is engaged in for profit. In fact, section 1.183-2(b)(6), Income Tax Regs., sets forth an analysis which can be beneficial to a taxpayer as it recognizes that during an initial or startup phase of an activity, the taxpayer may sustain a series of losses that are not necessarily an indication that the activity is not engaged in for profit. Therefore, we deny petitioner's motion to exclude paragraphs 1 and 2 of the Supplemental Stipulation of Facts. During taxable year 1980, petitioner engaged in several activities which were reported on a Schedule *377 C under the business name INCAPCO. Respondent contends that petitioner's INCAPCO activities were not activities engaged in for profit within the meaning of section 183. Respondent further agues that the deductions claimed by petitioner on Schedule C are not ordinary and necessary business expenses under section 162. Respondent also argues that petitioner's Schedule C dedections are nondeductible personal living expenses within the purview of section 262. The general rule of section 183(a) disallows deductions attributable to an activity which is not engaged in for profit. An "activity not engaged in for profit" is defined in section 183(c) as an activity for which deductions are not allowable under section 162 or under paragraph (1) or (2) of section 212. The proper standard for determining whether the activity is one which is engaged in for profit is whether the taxpayer engaged in the activity with the actual and honest objective of making a profit. Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The taxpayer's profit expectation need not be a reasonable one. Dreicer v. Commissioner, supra at 644-645; *378 Golanty v. Commissioner, 72 T.C. 411, 425 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(a), Income Tax Regs. Profit objective is a fact to be determined from all the facts and circumstances. Independent Electric Supply Inc. v. Commissioner, 781 F.2d 724, 727 (9th Cir. 1986), affg. Lahr v. Commissioner, T.C. Memo. 1984-472; Dreicer v. Commissioner, supra at 645; Golanty v. Commissioner, supra at 426; sec. 1.183-2(b), Income Tax Regs. A taxpayer's declaration of profit objective is not controlling, as greater weight is given to the objective facts and circumstances than to mere statements of intent. Beck v. Commissioner, 85 T.C. 557, 570 (1985); Dreicer v. Commissioner, supra; sec. 1.183-2(a) and (b), Income Tax Regs. Petitioner bears the burden of proving that she engaged in INCAPCO's activities with an actual and honest profit objective. Rule 142(a); Golanty v. Commissioner, supra.
Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list *379 of relevant factors, which are in large part a synthesis of >or prior case law, to be considered in determining whether an activity has been engaged in for profit. Benz v. Commissioner, 63 T.C. 375, 382-383 (1974). These factors include: (1) The manner in which the activity is carried on; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor is controlling, but rather it is an evaluation of all the facts and circumstances in the case, taken as a whole, which is determinative. Abramson v. Commissioner, 86 T.C. 360, 371 (1986); sec. 1.183-2(b), Income Tax. Regs.
An analysis of the factors set forth in section 1.183-2(b), Income Tax Regs., is *380 unnecessary with respect to a portion of INCAPCO'S activities. This is because petitioner never reached a point of carrying on a trade or business under section 162, or engaging in a business activity for profit under section 183. With respect to the CAGA project, petitioner's testimony is descriptive of attempts to investigate the possibility of developing and commercializing Dr. Isselbacher's anticancer agent. Petitioner met with persons in the business community to determine the most efficacious method to structure the business organization, attract investors, develop, and commercialize CAGA. Petitioner met with Dr. Isselbacher on occasion to discuss the type of business arrangement needed to provide financing for his research and to determine an acceptable ownership allocation for the rights to Dr. Isselbacher's discovery. Petitioner did not enter into any formal written agreement with Dr. Isselbacher. Petitioner's efforts to form a company to develop and commercialize CAGA never materialized. In fact, as of the date of the trial, petitioner was still attempting to attract investors to finance the CAGA project. Petitioner never derived any income from her efforts *381 related to the CAGA project. Similar to petitioner's efforts relating to the CAGA project, petitioner's efforts to purchase or form a syndicate to purchase the Queen Elizabeth Hotel in Paris never went beyond the investigative stage. Petitioner reviewed the financial statements of the Queen Elizabeth Hotel and talked to an attorney who was familiar with the hotel business in Paris. Petitioner never issued an offer for the purchase of the Queen Elizabeth Hotel, and never attempted to form a syndicate to fund the purchase of the Queen Elizabeth Hotel. With respect to petitioner's activities relating to the CAGA project and the purchase of the Queen Elizabeth Hotel, petitioner never reached the point of engaging in or carrying on any trade or business. Therefore, these activities cannot be the basis for the business deductions petitioner claimed for taxable year 1980 on Schedule C. During taxable year 1980, petitioner dabbled in several other activities for which she claimed business deductions on her 1980 Schedule C. Petitioner spent a substantial amount of time visiting art museums and art auction houses in Paris, New York City, and London. Petitioner had an interest in antiquities *382 such as Roman glass and vases, Chinese archaic bronzes, archaic Chinese jade, and Middle Eastern funeral bronzes. Petitioner also had an interest in forming a syndicate to purchase large European tapestries and then resell the tapestries for profit. Petitioner's 1980 activity included her promotion of a harpsichord recording by harpsichordist Belina Drandarova. In addition, petitioner testified that she had a business purpose for staying at the Caribe Hilton in San Juan, Puerto Rico. Petitioner's purported business purpose related to her interest in promoting the instructional methods of tennis professional Welby Van Horn. Petitioner testified that the business reason behind her visit to the Marbella Club in Marbella, Spain, was to determine whether Marbella would be a desirable location to establish an executive tennis program where business executives would have an opportunity to experience their tennis fantasy of playing against tennis professionals. The record in the instant case does not convince us that petitioner engaged in INCAPCO's activities with an actual and honest objective of making a profit. The most glaring omission in the instant case is the very lax and unbusinesslike *383 manner in which petitioner carried on her activities. A taxpayer who carries on an activity in a businesslike manner and maintains complete and accurate books and records may be engaged in an activity for profit. Sec. 1.183-2(b)(1), Income Tax Regs.
In the instant case, petitioner did not maintain a separate set of accounting records. Petitioner did not have a separate checking account or separate credit card for her INCAPCO activities. Petitioner listed her 1980 activities on a calendar which was similar to a wall calendar. Petitioner admitted at trial that some of the events listed on the calendar were not entered contemporaneously. The record in this case did not indicate which calendar entries were listed contemporaneously and which entries were listed subsequent to 1980. Petitioner testified that she utilized her hotel accommodations as both an office and living quarters during 1980. Petitioner paid the Hyde Park Hotel in New York City monthly rent of $ 1,600, or $ 19,200 for the year. Petitioner paid the annual amount of $ 19,200 even though petitioner spent only 6 weeks in New York City during 1980. Petitioner spent approximately 6-1/2 months in Paris, France, but *384 paid rent to the Queen Elizabeth Hotel in Paris based on an annual amount of $ 36,000. Petitioner did not maintain a separate and distinct office space for any of the INCAPCO activities during 1980. Petitioner made no attempt to allocate the rental expense paid to the Hyde Park Hotel or the Queen Elizabeth Hotel between business and personal usage. The unbusinesslike manner of petitioner's activity is further evidenced by the fact petitioner had to estimate some of the expenses deducted on her 1980 income tax return. Moreover, although petitioner established INCAPCO during taxable year 1980, petitioner deducted expenses incurred in 1979 but paid in 1980. Petitioner testified that she paid $ 3,000 to have a master recording made of Belina Drandarova's harpsichord music. On cross-examination, petitioner was asked whether she ever derived any income from the master recording of Drandarova's harpsichord music. Petitioner testified that she had not derived any income from the harpsichord master recording but others had sold reproductions of the master recording at a profit. When questioned as to whether she instituted any legal proceedings or sought repayment from the individuals *385 that profited from the master recording, petitioner replied that she had taken no steps to establish her right to share in the profits. In 1980, petitioner spent a substantial amount of time visiting art auction houses in New York City, Paris, and London. Petitioner admitted that she attended art auction houses prior to 1980, but she claimed that her attendance at art auction houses after 1980 was for a different purpose. Petitioner never successfully formed a syndicate of investors to buy and sell works of art. Petitioner never leased any space in Paris, New York City, or Boston, to display any works of art. Over a period of years, petitioner purchased a substantial number of art objects, none of which she had sold as of the date of trial. Between 1980 and the time of the trial of the instant case, petitioner never derived any income from the sale of works of art. Petitioner also testified that her stay at the Caribe Hilton Hotel and Condado Hotel in San Juan, Puerto Rico, was for the purpose of promoting the instructional methods of tennis professional Welby Van Horn. Petitioner did not have a written contract with Welby Van Horn, and failed to produce any documentation *386 which evidenced efforts to promote Van Horn's instructional methods during taxable year 1980. Petitioner never derived any income from her efforts to capitalize on the instructional methods of tennis professional Welby Van Horn. Petitioner produced letters she received from a producer at Pacific Mountain Network in Denver, Colorado. The letters petitioner produced were all dated in 1984, and therefore fail to establish that petitioner was involved in business activity in San Juan during 1980. Petitioner's failure to operate INCAPCO's activity in a businesslike manner is indicative of a lack of profit objective. Petitioner failed to establish that she spent a signficant amount of time and effort in carrying on a trade or business activity. Petitioner's calendar indicated that she spent a significant amount of time handling her personal investment portfolio. While in Paris, petitioner visited her investment broker, Bache, on nearly a daily basis. Petitioner also spent a great deal of time visiting art auction houses. Prior to 1980, petitioner frequently traveled between New York City, Paris, and London with her husband on business trips. Petitioner testified that prior to 1980, *387 she frequently visited art auction houses and had acquired an interest in various forms of works of art. The record indicates that petitioner never derived income from the sale of works of art during taxable year 1980 or for any year thereafter. The facts in the instant case clearly establish that petitioner's activity relating to buying and selling works of art had substantial personal or recreational aspects. Therefore, we conclude that the majority of petitioner's time and effort were attributable to personal activities. The fact that the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable. Sec. 1.183-2(b)(5), Income Tax Regs. Petitioner presented no evidence showing that she engaged in similar activities in the past and converted such activities from unprofitable to profitable enterprises. When a taxpayer's losses continued to be sustained beyond the period which customarily is necessary to bring the operation to profitable status, such continued losses, if not explainable as due to customary *388 business risk or reverses, may indicate that the activity is not being engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs. During taxable year 1980, petitioner failed to derive any income from the activities of INCAPCO. Furthermore, INCAPCO has not reported a net profit during its business existence. The fact that the taxpayer does not have substantial income or capital from sources other than the activity may indicate that an activity is engaged in for profit. Sec. 1.183-2(b)(8), Income Tax. Regs. For taxable year 1980, petitioner had substantial income from sources other than INCAPCO's activities. Petitioner had unearned income totaling $ 149,670. The facts in the instant case indicate that petitioner derived a significant amount of personal pleasure from the activities she engaged in during 1980. Prior to her husband's death in July 1979, petitioner spent time not only in New York where her husband was based as the liaison partner of the international banking firm of Lazard Freres, but also accompanied her husband on his regular extended visits to Europe. Petitioner testified that prior to 1980 she had spent most of her adult and business life in Paris and London. *389 After her husband's death in 1979, petitioner maintained her lifestyle of luxury and travel as she stayed at the Ritz Carlton in Boston, the Hyde Park Hotel in New York City, the Queen Elizabeth Hotel in Paris, the Caribe Hilton Hotel and Condado Hotel in San Juan, and the Marbella Club in Marbella. Prior to 1980, petitioner derived enjoyment from visiting art museums and art auction houses. During 1980, petitioner continued to spend a substantial amount of time visiting art auction houses and observing various forms of antiquities such as Roman glass, Chinese archaic bronzes, archaic Chinese jade, and Middle Eastern funeral bronzes, and other types of art such as European tapestries, ladies' antique painted fans, antique lace, and the contemporary art of artist Robert Morey. We find that petitioner's activity relating to art and her interest in harpsichord music involved substantial personal aspects. Section 262 states that no deduction shall be allowed for personal, living, or family expenses. We hold that petitioner's activities were personal in nature and therefore are nondeductible for Federal tax purposes. In conclusion, we hold that INCAPCO's activities were not engaged *390 in for profit within the meaning of section 183. Therefore, we sustain respondent's disallowance of the business deductions claimed on petitioner's Schedule C for taxable year 1980. The next issue for consideration is whether petitioner is liable for an addition to tax under section 6651(a)(1) for failure to timely file her Federal income tax return for taxable year 1980. Section 6651(a)(1) imposes an addition to tax for the taxpayer's failure to file a timely return unless such failure is due to reasonable cause and not due to willful neglect. Whether the failure to timely file is due to reasonable cause and not to willful neglect is a factual question with the burden of proof on the taxpayer. Baldwin v. Commissioner, 84 T.C. 859, 870 (1985). In the instant case, petitioner was granted an extension of time to file until October 15, 1981. Petitioner did not file her 1980 income tax return until October 1984. Petitioner contends that her delay in filing her 1980 income tax return was due to reasonable cause because she was unable to obtain certain documents from third parties that were necessary for the preparation of an accurate income tax return. Petitioner *391 testified that as late as the fall of 1982 she was unable to obtain the necessary documentation to file her 1980 income tax return. Petitioner provided no explanation for her failure to file the 1980 income tax return between the fall of 1982 and October of 1984 when the return was actually filed. Section 6651(a)(1) imposes an addition to tax equal to 5 percent of the amount required to be shown as tax on the 1980 return if the failure to file is not for more than 1 month, with an additional 5 percent for each additional month during which such failure continues, not exceeding 25 percent in the aggregate. The record indicates that the tax return was filed approximately 36 months after the due date. Petitioner failed to provide any testimony or present any evidence to justify the delay that occurred between the fall of 1982 and October 1984, when the return was finally filed. Therefore, even if we were to accept petitioner's explanation for the delay that occurred during the initial 12 months, petitioner has not satisfied the burden of proof with respect to the 24-month period between the fall of 1982 and the fall of 1984. Therefore, petitioner is liable for the addition to tax *392 under section 6651(a)(1). The final issue for decision is whether petitioner is liable for the addition to tax under section 6653(a) for negligence or intentional disregard of rules and regulations. Negligence is defined as the lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). After reviewing the entire record, we believe that a reasonable person under similar circumstances would not have reached the conclusion that the deductions claimed by petitioner on her 1980 Schedule C were deductible for Federal income tax purposes. Therefore, petitioner is liable for the addition to tax under section 6653(a). Decision will be entered under Rule 155.